**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-20830-CR-ALTMAN**

**UNITED STATES**,

    *Plaintiff*,

v.

**ODENIA SAMSON,**

    *Defendant*.

_____/

**ORDER**

After Odenia Samson was found with long lists of stolen identities and a loaded Glock, he confessed to selling thousands of dollars of cocaine. For these crimes, this Court sentenced him to 122 months in prison. Four years later, in the midst of the COVID-19 pandemic, Samson asked the warden of his facility to reduce his sentence to time served. After waiting just fifteen days for a response, Samson filed this Motion,[1] which this Court denies for two reasons. *First*, Samson has not substantiated his claim that his incarceration presents "extraordinary and compelling" circumstances. *Second*, he has not shown that he's no longer a danger to the community.

**THE FACTS**

The Defendant, Odenia Samson, is 37 years old. *See* Reply at 5. In 2016, he pled guilty to three counts of (1) possession of cocaine with intent to distribute, (2) possession of a firearm in furtherance of a drug-trafficking crime, and (3) aggravated identity theft. *See* Plea Agreement [ECF No. 157]. In exchange for Samson's guilty plea—and his cooperation against his co-

---

[1] The Motion is now ripe. *See* Motion for Modification of Sentence (the "Motion") [ECF No. 313]; Response to Motion for Modification of Sentence (the "Response") [ECF No. 321]; Reply to Response to Motion for Modification of Sentence (the "Reply") [ECF No. 327].

conspirators—the Government dismissed four other felony charges (for similar crimes). *Id.*; *cf.* Indictment [ECF No. 3].

In the factual proffer he submitted at his guilty plea, Samson admitted that law enforcement had intercepted phone calls that—together with his phone's location information—established his guilt of the cocaine charges. *See* Factual Proffer [ECF No. 157-1] at 1. So, for instance, in one such wiretapped call, a cocaine buyer had called Samson back to complain that, because the cocaine "was poor quality," the buyer was "having a hard time cooking the cocaine into crack." *Id.* at 2. In that same proffer, Samson acknowledged that the officers had witnessed him hand a bag of (what turned out to be) 28 grams of cocaine to a co-conspirator, who in turn sold it to a confidential informant. *Id.* Moreover, as the factual proffer noted, while police were executing a search warrant at Samson's house, he gave the officers permission to search his car. *Id.* at 2. Inside, the officers found Samson's wallet along with almost 200 grams of cocaine, a scale, a coffee grinder, and a loaded Glock. *Id*. As if that weren't enough, when the police entered Samson's house, they found "papers and ledgers" containing the Personal Identification Information ("PII") of over 3,000 people—many notated as "dead," "used," or "good." *Id.* at 3. The officers also discovered piles of Florida unemployment debit cards in the names of real Floridians who, unsurprisingly, had not given Samson permission to file claims on their behalf. *Id.* Suffice it to say, the evidence of Samson's guilt was overwhelming. All in all, Samson admitted to (1) selling at least half-a-kilogram of cocaine, (2) possessing a loaded firearm in furtherance of his drug trafficking, and (3) stealing (at least) fifteen people's identities. *Id*. at 4.

On October 4, 2016, Judge William Zloch of this Court sentenced Samson to 122 months in prison—to be followed by 120 months of supervised release. *See* Amended Judgment [ECF No.

251]. As of this writing, Samson's sentence is set to expire on June 29, 2024, which means he has 45 months—or roughly 36%—of his sentence remaining. *See* Response at 2.

On June 30, 2020, Samson asked the Warden of FPC-Montgomery—where he's currently housed—to grant him compassionate release. *See* Reply at 1. Fifteen days later, on July 15, 2020, Samson filed this Motion. *Id*. When Samson filed his Reply on August 31, 2020, the Warden still had not responded to his request. *Id.*

Some two months later, Samson filed a Motion to "supplement" his original Motion with a request for home confinement. *See* Motion to Supplement [ECF No. 334]. To this Motion to Supplement, Samson attached his resume, certificates of course completions, and a copy of his GED. *Id*. Since then, Samson has also filed a letter from his fiancée (the second such letter), *see* [ECF No. 332], affidavits from his cousin and sister, *see* [ECF Nos. 333, 336], and a letter from the Warden of FPC-Montgomery (dated October 21, 2020) denying his request for compassionate release, *see* Supplement [ECF No. 335].

## ANALYSIS

### I.   Home Confinement

As an initial matter, Samson's alternative request for home confinement, *see* Motion to Supplement at 4 ("I pray that you intervene Judge Altman and rule positively on my motion[] so that I may serve the rest of my sentence in the relative safety of home confinement."), must be denied because this Court cannot tell the BOP where to house its inmates, *see Tapia v. United States*, 564 U.S. 319, 331 (2011) ("A sentencing court can *recommend* that the BOP place an offender in a particular facility or program. *See* § 3582(a). But decisionmaking authority rests with the BOP."); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). And

3

home confinement is still a form of "incarceration." *United States v. Springer*, ____ F. App'x ____, 2020 WL 3989451, at *2 (10th Cir. July 15, 2020); *see also id.* ("Springer was transferred to home confinement under the recently enacted CARES Act due to the COVID-19 pandemic. Springer's transfer to home confinement is not a release from imprisonment, nor does this transfer reduce the length of his custodial sentence."); *United States v. Ko*, 739 F.3d 558, 561 (10th Cir. 2014) ("Section 3624(c) makes clear that, even though a prisoner is . . . in home confinement, he is still serving a 'term of imprisonment.' When read together, these statutes plainly indicate that a person is in the BOP's 'custody' while serving the remainder of a sentence in home confinement." (internal citations omitted)).

While the Eleventh Circuit has not clarified whether courts may order home confinement under § 3582(c)(1)—the compassionate release provision at issue here—its analysis of the closely-related § 3582(c)(2) is instructive. Like our § 3582(c)(1), § 3582(c)(2) allows an inmate to petition for a reduced sentence *only* after the U.S. Sentencing Commission has lowered the Guidelines range under which that inmate was sentenced. *See* § 3582(c)(2) ("In the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.").

And, in the context of § 3582(c)(2), the Eleventh Circuit has made clear that district courts may not intrude on the BOP's core sphere of expertise by directing an inmate to home confinement. *See United States v. Anderson*, 517 F. App'x 772, 775 (11th Cir. 2013) ("[T]o the extent that

Anderson requested that the district court order the BOP to place him in home confinement, that request is outside the scope of § 3582(c)(2). The BOP, not the district court, retained authority to choose the place of Anderson's incarceration.").

Notably, the only federal appellate court to consider this issue under the provision at issue here (§ 3582(c)(1)) has held—consistent with the Eleventh Circuit's approach in *Anderson*—that "the authority to grant home confinement remains solely with the Attorney General and the BOP." *United States v. Brummett*, 2020 WL 5525871, at *2 (6th Cir. Aug. 19, 2020). And the district courts in this Circuit agree. *See United States v. Bonilla Mesa*, 2020 WL 4757335, at *7 (S.D. Fla. July 17, 2020) ("Defendant asks, in the alternative, that the Court place him on home confinement for the remainder of his sentence. The Court has no authority to order this relief."); *United States v. Israel*, 2020 WL 3893987, at *9 (S.D. Fla. July 10, 2020) ("First, to the extent that Defendant seeks release to home confinement, the Court is without authority to grant the requested relief."); *United States v. Christian*, 2020 WL 5518616, at *1 (S.D. Ga. Sept. 14, 2020) ("This Court lacks the authority to order the BOP to release a prisoner on home confinement."); *United States v. Hester*, 2020 WL 5535010, at *1 n.1 (M.D. Ala. Sept. 15, 2020) ("To the extent that Hester seeks release to home confinement pursuant to the CARES Act due to the COVID-19 pandemic (doc. 66 at 10), the Court has no authority to order the Bureau of Prisons to change the Defendant's current place of incarceration."); *United States v. Brantly*, 2020 WL 5514571, at *1 (M.D. Fla. Sept. 14, 2020) ("However, the Court has no authority to direct the Bureau of Prisons (BOP) to place Brantley in home confinement because such decisions are committed solely to the BOP's discretion."). This Court, then, lacks authority to grant Samson the relief he seeks.

In some respects, of course, this discussion is academic because the Court could achieve the same result by simply reducing Samson's sentence to time served and then "impos[ing] a term

of supervised release equal to the unserved time and order, as a condition of that supervised release, that the defendant be confined to his home." *United States v. Spencer*, 2020 WL 5498932, at *2 (6th Cir. Sept. 2, 2020); *Israel*, 2020 WL 3893987, at *9 ("Although the Court does not have the authority to order a prisoner's release to home confinement, the Court does have the authority to reduce a defendant's sentence to time-served, impose a term of supervised release, and order home confinement as a condition of supervised release."). To do this, though, the Court would have to conclude that Samson has carried his burden of showing that he's entitled to that reduction, which, for the reasons set out below, he has failed to do.

## II.     Reduction in Sentence

Section 3582 sets out the order in which this Court should analyze a criminal defendant's entitlement to a sentencing reduction. *First*, when the defendant brings the motion himself, the Court must ascertain whether he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [whether there has been a] lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(a). *Second*, the Court should "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *Id. Third*, the Court should turn to the "extraordinary and compelling reasons" test, as outlined in U.S.S.G. § 1B1.13 cmt. n.1. And *fourth*, the Court should determine whether the defendant poses a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id. See United States v. Stuyvesant*, 454 F.Supp.3d 1236, 1238 (S.D. Fla. 2020) (applying the framework). The Court will discuss each of these four steps in turn.

### A. Exhaustion of Administrative Rights to Appeal

Samson never addresses the exhaustion requirement in his Motion. *See generally* Motion. Instead, in his Reply, he contends that he has exhausted his administrative remedies because it has been more than 30 days since he sent his letter to the Warden. *See* Reply at 3–4 ("[I]f the 30 days has [sic] passed before a court ruling, than [sic] the defendant has satisfied his administrative remedies under the First Step Act.").[2] The Government, anticipating this argument, contends that Samson had to wait 30 days *before* filing his Motion. *See* Response at 6.

But, by not advancing this point in his Motion—and by surprising the Government with it in his Reply—Samson has waived the argument. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). In any case, Samson's argument is unpersuasive. While the Eleventh Circuit has not addressed the issue, the Sixth Circuit has said that, even if a defendant could exhaust his administrative remedies by adding the days that have passed before he filed his motion to the number of days that passed after he filed his motion, district courts "should dismiss [these motions] without prejudice. . . . If (rather than dismissing) we sat on untimely compassionate release motions until the 30-day window ran its course, we could end up reviewing stale motions.

---

[2] Samson mentions that "many courts, including those in the 5th Circuit, have waived exhaustion requirements of the BOP's interminable Administrative Remedies Process . . . where the administrative process is incapable of granting timely relief." Reply at 3–4. But, because Samson never made this argument in his Motion, he has waived the point. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). In any event, this Court has already interpreted Supreme Court precedent as prohibiting any such waiver of a statutorily-mandated exhaustion requirement. *See United States v. Leija*, 2020 WL 3547029, at *3 (S.D. Fla. June 30, 2020) (Altman, J.) ("[F]ederal judges may not waive exhaustion requirements that appear unambiguously in the text of a statute. And the text of § 3582(c)(1)(A) could not be clearer." quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required . . . .")).

Better to have [the movant] refile with the benefit of whatever additional insight he may have gleaned." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020) (Sutton, J.); *cf. Israel*, 2020 WL 3893987, at *6 ("The statute does not place a thirty-day waiting period on the Court's authority to entertain the motion; rather, it places a thirty-day waiting period on the prisoner's ability to file the motion on his own behalf.").

Fortunately, this Court need not decide today whether post-filing time can operate to satisfy the exhaustion requirement because, even if it could, Samson's Motion would, for the reasons set out below, still be denied.

### B.     18 U.S.C. § 3553

After considering the relevant § 3553 factors, Judge Zloch sentenced Samson to 122 months in prison. *See* Judgment. Samson did not appeal, and the time to do so has long passed. Samson does not challenge this Court's application of the § 3553 factors. *See generally* Motion.[3] And so, to the extent they are applicable, those factors counsel against a reduction here.

### C.     18 U.S.C. § 3582

District Courts have "no inherent authority" to modify a prison sentence. *United States v. Diaz-Clark*, 292 F.3d 1310, 1315, 1319 (11th Cir. 2002). Instead, the "authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194–95 (11th Cir. 2010). The statute that governs sentence reductions for compassionate medical release provides, in pertinent part, as follows:

> **(c) Modification of an imposed term of imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that—

---

[3] Samson's suggestion that his post-incarceration conduct justifies a reduction, *see* Reply at 6, turns not so much on the § 3553 factors as on the separate (and somewhat distinct) application of the § 3412(g) factors (more on this below)—which specifically assess the degree of a defendant's threat to society.

> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and

18 U.S.C. § 3582(c)(1).

Because Samson is not "at least 70 years of age," he does not qualify for release under § 3582(c)(1)(A)(ii). The viability of his request thus turns on the "extraordinary and compelling reasons" test in § 3582(c)(1)(A)(i). But Section 3582 never describes the kinds of "[e]xtraordinary and compelling reasons" that might "warrant a reduction." Under 28 U.S.C. § 994, however, the United States Sentencing Commission (the "Commission") is authorized to "describe what should be considered extraordinary and compelling reasons for sentence reduction [under 18 U.S.C. § 3582]." 28 U.S.C. § 994(t). And the Commission has helpfully defined the contours of the test as follows:

> 1. **Extraordinary and Compelling Reasons.--**Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> **(A) Medical Condition of the Defendant.**
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> **(B) Age of the Defendant.--**The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13 cmt n.1.

The reference to "subdivision (2)" requires the Defendant to show that he is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). And § 3142(g), in turn, instructs federal courts to consider the following factors when determining whether a defendant poses a danger to the safety of any other person or the community:

> **(g) Factors to be considered.--**The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g).

The Defendant bears the burden of establishing both that his circumstances qualify as "extraordinary and compelling reasons" and that he no longer represents a danger to any other person or the community. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *see also Cannon v. United States*, 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019); *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019).

As a preliminary matter, Samson cannot satisfy the "Age of the Defendant" test: He is 37 years old, not 65; he has not alleged any age-related decline; and he has served neither 10 years

11

nor 75% of his overall sentence. His request for relief, then, hinges on his ability to meet either of the two elements of the "Medical Condition of the Defendant" test. The first element requires him to show that he suffers from a "terminal illness." U.S.S.G. § 1B1.13 cmt n.1(1)(A)(i). The second requires him to establish that he suffers from any of three conditions "that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt n.1(1)(A)(ii).

Samson claims to have hypertension and a history of smoking. *See* Mot. at 2. Samson also argues that "the virus causes serious illness and elevated risk of death in black individuals." Motion at 2; *see also id.* Ex. 1 ("Black People Are Disproportionately Getting and Dying From COVID-19.").[4] Samson says that he's prescribed "Amlodopine, metroprolol and Baby Aspirin" for "these and other conditions." Reply at 5.

But Samson has submitted *no* medical evidence to support his claim to hypertension. *See generally* Motion; *see also* Reply. This Court will not release Samson on the basis of an unsubstantiated medical claim. *See United States v. Cabrera*, 2020 WL 6219332, at *5 (S.D. Fla. Oct. 22, 2020) (Altman, J.) ("This Court will not release Cabrera on the basis of unsubstantiated claims about diseases he himself never disclosed, either to this Court (at sentencing) or to the BOP."); *Heromin*, 2019 WL 2411311, at *2 ("But the bulk of Heromin's Motion rests on his self-diagnosis—not upon the judgment of his medical provider. . . . Without his medical provider corroborating either of these requirements [for compassionate release], Heromin has not shown a foundation for compassionate release based on his medical condition.").

---

[4] In his Reply, Samson also avers that he has a body mass index (BMI) of 31.6—which, he contends, renders him obese. *See* Reply at 5. Again, this Court will not consider arguments Samson raised for the first time in his Reply. *See In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

Nevertheless, even accepting that Samson suffers from hypertension—and that he's obese and has a history of smoking—his Motion fails. To begin with, Samson never argues that his conditions either (1) constitute a "serious physical or medical condition," (2) qualify as "a serious functional or cognitive impairment," or (3) are part of his "deteriorating physical or mental health because of the aging process," as required by U.S.S.G. § 1B1.13 cmt n.1(1)(A)(ii). *See generally* Motion. Nor does Samson contend that he suffers from any "terminal" illnesses under U.S.S.G. § 1B1.13 cmt n.1(1)(A)(i). *See id.*

The Court acknowledges that the spread of COVID-19 has been pervasive and devastating. It has challenged our institutions, undermined Americans' ability to maintain their economic security, and altered the way people interact. More fundamentally, it goes without saying, the pandemic has resulted in widespread suffering. In the United States alone, more than 17,700,000 people have tested positive for the disease, and over 316,000 Americans have died from it. *See* CDC, *COVID Data Tracker*, available at https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last accessed Dec. 21, 2020).

And, while "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release," *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the CDC has recognized that hypertension, obesity, and a history of smoking "might" put people "at increased risk of a severe illness."[5] It is, therefore, conceivable that Samson *could* suffer a "serious physical . . . condition" *if* he were to contract COVID-19.[6] But, even considering Samson's (theoretically) enhanced susceptibility to

---

[5] CDC, *People at Increased Risk: People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Dec. 21, 2020).

[6] Samson also asserts that black people are more susceptible to serious illness from COVID-19. *See* Motion at 2. But his only support for this proposition is an April 7, 2020 article, which found

13

COVID-19, for three reasons, Samson's conditions do not constitute the kinds of "extraordinary and compelling reasons" that would justify the reduction he is seeking.

*First*, Samson provides no evidence to support his view that "FPC Montgomery is an overcrowded mess and will be a prime incubator for the virus." Motion at 3. Nor could he. In fact, as of this writing—some six months after his Motion was filed—there are only a few-dozen cases of COVID-19 at FPC-Montgomery. *See* Bureau of Prisons, COVID-19 Cases, available at https://www.bop.gov/coronavirus/ (last accessed Dec. 21, 2020). FPC-Montgomery's success (thus far) at insulating its prison population from the disease is, in the Government's view, unsurprising. As the Government has explained, BOP has taken—and will continue to undertake— drastic measures to make FPC-Montgomery as safe as possible in the circumstances. These include "requir[ing] that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease" and allowing "[o]nly limited group gathering" with "attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access." Response at 3. The BOP has also "severely limited the movement of inmates and detainees among its facilities" and canceled "all official staff travel" and "most staff training." *Id*. In addition, the Government says, under current BOP operating protocols, "[a]ll staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing

---

that blacks were at higher risk from COVID-19 because of "long-standing health disparities between racial groups." *Id.* Ex 1. at 2. In other words, the article didn't posit that the virus targets black people more aggressively than, say, whites. It simply pointed out that, for a variety of socio-economic reasons, black people both were infected in higher numbers and then had less access to suitable healthcare. *See generally id*. None of this, then, suggests that Samson—whose likelihood of contracting COVID-19 and access to quality BOP healthcare are identical to the other inmates at his facility (irrespective of race)—should be treated differently than other inmates *because of* his race.

cannot be achieved." *Id.* at 4. Most importantly, perhaps, the Government notes that BOP is screening and quarantining all new inmates. Specifically, "[a]symptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff," while "[s]ymptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation." *Id.*

In his Reply, Samson concedes that—at least initially—his housing unit was a "bubble" but counters that, in late August, inmates from other units were moved into his "without any quarantine or screening." Reply at 2. That may be true. But the numbers don't lie. And the numbers suggest that the FPC-Montgomery's protocols have been effective at preventing the spread of COVID-19. *See* Bureau of Prisons, *COVID-19 Cases*. Samson's concerns are thus speculative and conjectural.

*Second*, even if he *were* to contract COVID-19, Samson does not dispute that he is—and for some time has been—taking medications (and receiving medical care) to help bring his conditions under control. *See* Reply at 13. And Samson never argues that, *with* this medication and treatment, his conditions somehow expose him to a greater risk of death than that faced by the average inmate.

*Third*, Samson does not allege that his health conditions are significantly deteriorating, and "the BOP Director has not found COVID-19 alone to be a basis for compassionate release." *United States v. Harris*, 2020 WL 1969951, at *2 (M.D. Fla. Apr. 24, 2020) (citing *United States v. Eberthard*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020)). The Court sees no reason to depart from the BOP's well-reasoned view on this question.

Because Samson has not shown that his circumstances are either "compelling" or "extraordinary," his Motion must be **DENIED**.

15

### D.  18 U.S.C. § 3142

Even if Samson *had* shown compelling circumstances, his Motion would still be denied because he has failed to establish that he no longer poses a danger to his community. As the relevant Sentencing Guidelines provision makes clear, the "extraordinary and compelling reasons" test only applies if "the defendant meets the requirements of subdivision (2)"—that is, only if the Defendant demonstrates that he no longer poses a threat to society, as defined by 18 U.S.C. § 3142.

In assessing dangerousness, Section 3142(g) requires the Court to consider: (1) "the nature and circumstances of the offense . . ., including whether the offense . . . involves . . . a controlled substance, firearm, explosive, or destructive device"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . (A) the person's . . . past conduct . . . [and] criminal history"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." Each of these factors weighs against Samson here.

*First*, Samson pled guilty to both possession of cocaine with intent to distribute *and* possession of a firearm in furtherance of a drug-trafficking crime; his "offense[s] of conviction thus "involve . . . a controlled substance [and a] firearm."

*Second*, the evidence against Samson—as set out in the Factual Proffer—was both overwhelming and undisputed. *See generally* Factual Proffer.

*Third*, Samson has an extensive criminal history—and, in particular, a history of not abiding by the conditions of his release. *See* Presentence Investigation Report ("PSR") [ECF No. 179]. Samson's long criminal history began in 1999, when he was tried, convicted, and sentenced as an adult for armed burglary and grand theft and given a year in jail—followed by one year of probation. *Id.* ¶ 59. But, upon his release, Samson quickly violated the terms of his probation—

which landed him in jail for three additional months. *Id.* Then, over the next two years (between 2001 and 2003), Samson was arrested *four times* for driving with a suspended license. *Id.* ¶¶ 62–63 (detailing arrests in November 2001, June 2002, December 2002, and March 2003). Because he failed to appear in court in the two latter cases, a judge sent him to jail for a few days. *Id.*

In 2003, the police stopped Samson for an illegal window tint. *Id.* ¶ 60. As the officers approached his car, they noticed what looked like a gun. *Id.* Seeing the officers' concern, Samson leapt out of the vehicle and tried to flee—only to get caught doing so. *Id.* One month after the judge sentenced him to two years' probation, *id.*, Samson violated his probation by carrying a concealed firearm and possessing a counterfeit license plate. *Id.* ¶ 61. Somehow, the judge released him on bond anyway and, in an amazing display of incorrigibility, Samson then got himself arrested again. *Id.* For all these crimes, the judge sentenced Samson to five years in prison. *Id.* Samson completed this sentence in 2011. *Id.* Then, just four years later, he committed the (very) serious crimes that formed the basis of this case. Samson, in short, has a long criminal record, pockmarked with release violations and sprinkled here and there with a disinclination to appear in court.

Samson claims to have changed.[7] In his Reply, he says that he has "worked himself down" to a minimum-security categorization. *See* Reply at 7. And, indeed, while at FPC-Montgomery, Samson finished his GED, completed apprenticeships in HVAC and plumbing, took "self help

---

[7] Fedline Bonheur, Samson's fiancée, agrees. *See* Letter from Fedline Bonheur [ECF No. 327] ("I can assure you, that Odeni [in original] Samson is no longer a boy. He has taken full accountability for the choices he has made in life, and the people he has allowed in them. Now he's become a man."). The Court appreciates Ms. Bonheur's show of support. But it's the Court's job to balance Ms. Bonheur's sentiments—tinged, as they must be, by deep personal feelings and affection—against Samson's demonstrated record of recidivism.

classes," and worked as the "#2 compound cook." *Id.* The Court also notes that Samson's transcript reveals no disciplinary incidents. *See* Individualized Reentry Plan [ECF No. 326-1].

The Court commends Samson for his diligence and hard work in prison. Still, he has failed to carry his burden of showing that he's no longer a danger to society. Samson has spent much of his adult life in prison—in large measure because he has a long history of violating the terms of his release. Given this history, this Court simply cannot trust Samson when he says that he's changed, that he'll hereafter abide by the terms of his release, and that he promises to become a productive member of our community.

*Fourth*, Samson never contends that he's no longer a danger to society. *See generally* Motion; *see also* Reply. Nor can he. Samson's PSR reveals *five* felony convictions—three involving firearms and two for stealing other peoples' identities (or property). *See* PSR ¶ 61; *see also* Judgment.

In short, Samson pled guilty to some very serious crimes, he has an extensive criminal history, he's repeatedly violated the conditions of his release, and he's failed to show that he's no longer a danger to his community. On these facts, this Court will not release him early.

\*\*\*

Accordingly, after a careful review of the parties' filings, the record, and the governing law, the Court hereby **ORDERS and ADJUDGES** as follows:

1. The Defendant's Motion for Reduction in Sentence [ECF No. 313] is **DENIED**.
2. The Defendant's Motion to Supplement [ECF No. 334] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 23rd day of December 2020.

                                                **ROY K. ALTMAN**
                                                **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record
        Odenia Samson, *pro se*